**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**SEP 1 1999**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

DIANE KAFERLY,

     Plaintiff-Appellee,

v.

US WEST TECHNOLOGIES and US
WEST COMMUNICATIONS, INC.,

     Defendants-Appellees.

No. 98-1165
(D.C. No. 97-B-1290)
(D. Colo.)

**ORDER AND JUDGMENT**[*]

Before **PORFILIO**, **EBEL**, and **LUCERO**, Circuit Judges.

Defendants-Appellants US WEST Technologies and US WEST

Communications, Inc. ("US WEST") appeal from the district court's sua sponte

award of summary judgment to Plaintiff-Appellee Diane Kaferly on Kaferly's

ERISA claims against US WEST, her employer. Our jurisdiction arises under 28

U.S.C. § 1291. Because we find that the underlying decision of the Employee

---

[*] This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. This court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Benefits Committee to deny benefits to Kaferly was neither arbitrary nor capricious, we reverse the district court's award of summary judgment to Kaferly, and remand the case to the district court with instructions to enter summary judgment for US WEST.

## FACTS

Despite the complexity of the US WEST Pension Plan ("Plan") under scrutiny here, the dispute in this case is straightforward. Plaintiff-Appellee Diane Kaferly, an employee of Defendants-Appellants US WEST since 1991, contends that she is entitled to Term of Employment ("TOE") credit under the Plan for her years of prior service with Bell Telephone Labs ("BTL"). US WEST argues that Kaferly is not entitled under the Plan to bridge her prior service with BTL.

Kaferly worked for BTL, a subsidiary of AT&T, from 1971 to 1978.[1] At that time, AT&T companies were governed by a single pension plan (the Bell System Pension Plan), under which employees could transfer among AT&T companies and carry with them their years of service credit for pension purposes.

---

[1]US WEST asserts that after proceedings in the district court were concluded and this case was appealed, it discovered that Kaferly began working for BTL in 1973, not 1971 as she alleged and as the district court believed. Thus, US WEST asserts that Kaferly completed only 5 ½ years of service with BTL, not 7 ½. For purposes of this appeal we cannot consider this assertion, as it was not part of the record below.

Kaferly contributed to a BTL retirement plan during her tenure there, and left BTL in 1978 to pursue a Ph.D.

In 1982, federal antitrust litigation forced AT&T to split into independent companies. As a result of the divestiture, the assets of the Bell System Pension Plan were divided among the divested companies and each newly formed company adopted its own pension plan. To ensure the portability of employee benefits after divestiture, these new companies, including US WEST, entered into two agreements that continued portability under certain limited circumstances. These agreements are the Divestiture Interchange Agreement of January 1, 1984 ("DIA"), and the Mandatory Portability Agreement of January 1, 1985 ("MPA").

In 1990, Kaferly returned to technical work as an independent contractor with US WEST. In April 1991, she accepted an offer of full-time employment at US WEST.

Kaferly alleges that in March 1991, prior to accepting the full-time offer with US WEST, she met with her supervisor, Bruce Robinson, to discuss the terms of her employment, and that Robinson told her that her prior years of service with BTL would transfer or "bridge" to her US WEST employment for retirement purposes after she worked at US WEST for another five years. Kaferly asserts that US WEST human resources personnel reiterated that her prior service would bridge; she contends that she would not have accepted the full-time offer

had she been unable to bridge her prior years with BTL. Kaferly did not receive a copy of the Plan or the Summary Plan Description ("SPD") (and thus did not read either the Plan or the SPD) before she accepted the full-time offer in April 1991. She did review copies of the employee benefits handbook (which constitutes the SPD), but only after starting full-time employment with US WEST.

Kaferly asserts that during the first five years of her employment with US WEST, she periodically inquired about her bridging status, and was repeatedly told that she needed to do nothing more than complete her five years of service with US WEST for her prior service with BTL to bridge.

In November 1996, after Kaferly had completed 5 ½ years with US WEST, the company's Employee Benefits Committee ("EBC") denied Kaferly's bridge request, stating that her prior years of service with BTL would not bridge under the Plan.

On June 3, 1997, Kaferly filed suit against US WEST in state court, alleging that US WEST knowingly or negligently misrepresented to her that she could bridge her prior BTL service, and that the EBC misinterpreted the Plan in violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461. She asserted three state common law claims – breach of contract, promissory estoppel, and misrepresentation – and two federal claims – federal common law equitable estoppel and a claim for benefits under ERISA, 29

U.S.C. § 1132(a)(1)(B). On June 20, 1997, US WEST removed the case to federal court and moved for summary judgment.

The district court granted summary judgment to US WEST on plaintiff's state law claims, ruling that these claims were preempted by ERISA. The district court also granted summary judgment to US WEST on plaintiff's federal equitable estoppel claim, ruling that because the terms of the Plan were not ambiguous, plaintiff had failed to establish the elements of an equitable estoppel claim. The district court denied summary judgment to US WEST on Kaferly's ERISA claim, however, and sua sponte entered summary judgment in Kaferly's favor on this claim, ruling that the SPD unambiguously entitled Kaferly to bridge her prior service with BTL upon completion of five years of continuous service with US WEST, and that therefore, the EBC had acted arbitrarily, capriciously, and contrary to law when it denied Kaferly's bridge request.

US WEST filed a motion for a new trial and/or to alter or amend the judgment. The district court denied this motion and US WEST now appeals.[2]

---

[2]Kaferly does not cross-appeal, nor does she argue against, the adverse ruling on her state law claims for breach of contract, misrepresentation, or promissory estoppel; likewise, she has not formally cross-appealed the adverse ruling on her federal equitable estoppel claim, although she does argue equitable estoppel in her answer brief as an alternative basis for affirming the summary judgment entered in her favor by the district court.

**DISCUSSION**

Standard of Review

The district court's determination that the EBC's decision was arbitrary and capricious is a legal conclusion. Thus, "our review of the district court's decision, although not the underlying administrator's decision, is plenary." Sandoval v. Aetna Life & Cas. Ins. Co., 967 F.2d 377, 380 (10th Cir. 1992).

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Jones v. Kodak Med. Assistance Plan, 169 F.3d 1287, 1291 (10th Cir. 1999). A court may enter summary judgment sua sponte only when there is no dispute of material fact and the losing party has had an adequate opportunity to address the issues involved, including an adequate time to develop any facts necessary to oppose summary judgment. See David v. City and County of Denver, 101 F.3d 1344, 1358-59 (10th Cir. 1996), cert. denied, 118 S. Ct. 157 (1997).

In reviewing a challenge to a denial of benefits under 29 U.S.C. § 1132(a)(1)(B), we apply an "arbitrary and capricious" standard when examining a plan administrator's decision "if the plan grants the administrator discretionary authority to determine eligibility for benefits or to construe the plan's terms."

Charter Canyon Treatment Ctr. v. Pool Co., 153 F.3d 1132, 1135 (10th Cir. 1998)

(citing Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989)); see also

Millensifer v. Retirement Plan, 968 F.2d 1005, 1009 (10th Cir. 1992) ("[I]f the

Plan gives the retirement committee discretion to construe doubtful provisions of

the plan itself, the committee's decision must be upheld unless it was arbitrary

and capricious, not supported by substantial evidence, or erroneous on a question

of law.") (internal quotations omitted)).[3]   We will not set aside a retirement

committee's decision if it was based on a reasonable interpretation of the plan's

terms and was made in good faith.  See Jones, 169 F.3d at 1292; Averhart v. US

WEST Management Pension Plan, 46 F.3d 1480, 1485 (10th Cir. 1994).


I. ERISA Claim

At issue in this case is the calculation of Kaferly's Term of Employment

("TOE"); specifically, whether Kaferly is entitled to bridge her years of service at

---

[3]Ordinarily, if a plan administrator or fiduciary is operating under a conflict of interest, the conflict will trigger a less deferential standard of review, with the level of deference decreasing in sliding scale fashion in proportion to the severity of the conflict.  See Jones, 169 F.3d at 1291; Chambers v. Family Health Plan Corp., 100 F.3d 818, 826 (10th Cir. 1996).  The conflict is weighed as one factor in determining whether the plan administrator's action decision was arbitrary and capricious.  See Firestone, 489 U.S. at 115; Jones, 169 F.3d at 1291; Charter Canyon, 153 F.3d at 1135.  Here, however, Kaferly does not contend that the EBC operated under any conflict of interest, nor do we discern any such conflict; therefore, we need not temper the deference owed to the EBC's decision.

BTL to increase her TOE. US WEST contends that it is entitled to summary judgment because the terms of the Plan[4] and the SPD unambiguously establish that Kaferly is not entitled to bridge her prior service with BTL. US WEST further contends that the district court erred in granting summary judgment sua sponte to Kaferly because the court's ruling relies on the wrong provision of the SPD, and because it wrongly assumed that Kaferly's vesting status at BTL was not in dispute, when in fact US WEST had submitted an affidavit that called Kaferly's vesting status at BTL into doubt. Finally, US WEST argues that even if the terms of the Plan are ambiguous, it is still entitled to summary judgment, because the Plan vests the EBC with discretion to interpret Plan provisions,[5] such

---

[4]The district court hinged its ERISA ruling on the language of the SPD; the court noted in its order that "[o]nly US WEST's 1996 employee benefits handbook [the SPD] is part of the record." The only actual Plan provision mentioned in the court's order is § 2.2(a), which was quoted by the EBC in its letter to Kaferly denying her bridge request. Thus, the district court apparently did not consult the Plan in its entirety. However, in the record before us, it appears that both sides submitted copies of the Plan among the exhibits attached to their memoranda on the summary judgment motion. As a result, we assume that the Plan was part of the record before the district court, and therefore include its provisions in our analysis of Kaferly's ERISA claim.

[5]Section 8.7 of the Plan provides in relevant part:

The Committee shall administer the Plan and shall have all power and authority necessary for that purpose, including, but not by way of limitation, the full discretion and power to interpret the Plan, to determine the eligibility, status, and rights of all persons under the Plan and in general to decide any dispute.

that under Millensifer, the EBC's decision must be upheld unless it was arbitrary or capricious. Here, US WEST submits, the EBC's decision to deny Kaferly's bridge request was based on a reasonable interpretation of the Plan, and its determination therefore should have been upheld by the district court.

"In interpreting the terms of an ERISA plan we examine the plan documents as a whole and, if unambiguous, we construe them as a matter of law." Chiles v. Ceridian Corp., 95 F.3d 1505, 1511 (10th Cir. 1996). Here, the ERISA plan is comprised of five documents:[6] 1) the Pension Plan ("Plan"); 2) the Summary Plan Description ("SPD"); 3) the Divestiture Interchange Agreement ("DIA"); 4) the Mandatory Portability Agreement ("MPA"); and 5) the Portability Guidelines. The new companies that emerged after the AT&T divestiture entered into the DIA and MPA to preserve the benefits of certain employees who transfer among specified companies. The Plan, which was drafted after divestiture, refers to and incorporates by reference both the DIA and MPA. The SPD and Portability Guidelines purport to interpret the Plan, the DIA and the MPA.

---

In addition, § 13.2(f) provides:

> The Committee shall each have full discretionary authority to determine eligibility, status and rights of all persons under the Plan and to construe any and all terms of the Plan.

[6]Kaferly asserts, and US WEST does not dispute, that all of these documents were before the EBC when it denied Kaferly's bridge request.

A. Pension Plan Language

1. "Term of Employment"

Under the Plan, "Term of Employment" means "a period of continuous employment of an Employee as provided in Article II." (Plan at § 1.65.) An "Employee" is "any individual employed by any Participating Company on a full-time or part-time basis who receives a regular stated compensation other than a pension, retainer, or fee under contract." (Plan at § 1.15.) A "Participating Company" means "US WEST or any subsidiary of US WEST that, with the consent of the Committee, participates in the Plan. No Former Affiliate or Associated or Allied Company, whether or not previously a Participating Company in this or any Predecessor Plan, shall be considered, or may become, a Participating Company." (Plan at § 1.41.) BTL was not a subsidiary of US WEST, and as such, is not a Participating Company; rather, as a subsidiary of AT&T, it is considered an "Interchange Company" or "Portability Company."

Article II of the Plan provides:

2.2 Term of Employment

a) An Employee's Term of Employment is a period of continuous employment of an Employee in the service of one or more Participating Companies, Interchange Companies (to the extent that an Interchange Agreement is applicable to the individual at the time the individual becomes an Employee or with respect to any individual who was an Employee of a Former Affiliate on December 31, 1983 and became an Employee on January 1, 1984) or Portability Companies (to the extent that the Mandatory Portability Agreement is

- 10 -

<u>applicable to an individual at the time the individual becomes an Employee</u>) . . . . Notwithstanding the foregoing, Term of Employment shall not include any period of employment that is included in an individual's term of employment under an Interchange Company Pension Plan or a Portability Company Pension Plan if the applicable Interchange Agreement or the Mandatory Portability Agreement is not in force and effect at the time an individual becomes employed or reemployed by a Participating Company or if such agreement does not provide for the recognition of such individual's term of employment under the Interchange Company Pension Plan or Portability Company Pension Plan upon his employment by a Participating Company.

(Emphasis added.)

Thus, under the Plan, an employee's TOE is generally the number of consecutive years that the employee works for a Participating Company, and if appropriate, an employee's prior service at an Interchange Company or Portability Company (such as BTL), but only to the extent that the individual is covered by an Interchange Agreement or the MPA at the time the individual becomes an employee with the Participating Company. Kaferly's TOE therefore includes her years of service at US WEST (a Participating Company), and may include her years at BTL (an Interchange Company) only if either the DIA or MPA applies to her as of the time she became an employee of US WEST.

In its letter denying Kaferly's bridge request, the EBC set forth the above-quoted § 2.2(a) of the Plan and concluded that Kaferly's prior service could not be recognized because she was "not an employee of an Interchange or Portability

Company on December 31, 1983." (Letter 7/29/96.) The district court concluded that Kaferly is not covered under either the DIA or MPA, and we agree.

The DIA governing this case permits recognition of full credit for years of service at an Interchange company for "any covered employee who becomes employed by [US WEST] during the calendar year 1984." (DIA at 20.) The Portability Guidelines, which interpret the DIA, provide in relevant part:

> The DIA provides for the mutual recognition of service credit and the interchange of benefit obligations with respect to employees who move among the AT&T companies and the divested former Bell System Companies for certain periods of time and under certain specified conditions. . . .
>
> Any employee with prior Bell System service who rehired during calendar year 1984 (true-up period) . . . shall be covered under the DIA. . . .
>
> Upon verification of prior service and coverage under DIA, full term of employment and vesting service may be granted to the employee.

(Portability Guidelines, §§ 8(A), (B), (C)) (Second emphasis added.)

Kaferly left BTL in 1978 and was not reemployed by US WEST during 1984; instead, she joined US WEST as a full-time employee in 1991. Therefore, the DIA is inapplicable to her.

Likewise, Kaferly is not covered by the MPA. To be covered under the MPA, an employee must have been an active employee on December 31, 1983. This is clear under § 1.6 of the MPA as well as pages L11-L12 of the SPD.

Again, because Kaferly left service in 1978 and did not return to full-time status until 1991, the MPA does not apply to her.

### 2. TOE Bridging Rules

The other Plan provision critical to this case is § 2.4, which discusses TOE bridging rules. Section 2.4 provides in relevant part:

> 2.4 <u>Breaks in Service; Periods of Severance - Bridging Rules</u>
> . . .
> (b) <u>Term of Employment</u>
>     (1) An <u>absence from service</u> without pay . . . <u>shall constitute a break in the continuity of the Term of Employment.</u>
>     (2) . . . If the Employee's absence from service is longer than six months and if the Employee had previously completed six months of continuous service at the time the absence commenced, the <u>Employee shall be credited with all service prior to his absence upon the Employee's completion of five years of continuous service after the return to service.</u>
>     (3) An absence from service while in the employ of a Former Affiliate or a Portability Company shall constitute a break in continuity of service unless the Employee is transferred to or reemployed by a Participating Company <u>while covered by an Interchange Agreement or the Mandatory Portability Agreement</u>.

Although it would appear at first blush that under § 2.4(b)(2) Kaferly could be credited with her prior service – because her absence from service exceeded six months, she had completed six months' continuous service prior to leaving, and she completed five additional years of service after being reemployed – such a reading of the Plan is myopic. As its very subtitle states, § 2.4(b) addresses the

bridging rules as they apply to one's "Term of Employment," which, as discussed above in § 2.2(a) of the Plan, does not entitle Kaferly to bridging, as "TOE" is limited to: 1) service at a Participating Company; or 2) service with an Interchange Company or Portability Company, provided that the individual is covered by the DIA or MPA. Moreover, § 2.4(b) references "Employee," which is defined in the Plan at § 1.15 as an <u>active employee</u> of a <u>Participating Company</u>, indicating that the bridging rules in § 2.4 are intended only to consider service (albeit interrupted) with a Participating Company. Finally, § 2.4(b)(3) separately addresses an Employee's absence from service while in the employ of a <u>Portability Company</u>, and, consistent with § 2.2(a), provides that prior service with a Portability Company will bridge only if the employee is reemployed by a Participating Company while covered by the DIA or MPA.

Under § 2.2, Kaferly's prior service at BTL does not qualify as prior TOE because it was not service at a Participating Company, nor was Kaferly covered by the DIA or MPA. Accordingly, § 2.4(b) does not cover her prior service with BTL. In sum, under the language of the Plan, as further elaborated through the DIA and MPA, Kaferly's prior service with BTL does not count as TOE, and therefore cannot bridge.

B. SPD Language

The district court did not look beyond § 2.2 of the Plan. Instead, the court deemed § 2.2 to be in conflict with language in the SPD, and held that as such, the terms of the SPD controlled. It is true that, where the SPD and the Plan language differ, the SPD is binding. See Semtner v. Group Health Serv. of Okla., Inc., 129 F.3d 1390, 1393 (10th Cir. 1997). However, "it is axiomatic that if a summary's language can trump language contained in the master plan documents in the event of a conflict, the documents must actually conflict." Charter Canyon, 153 F.3d at 1137. Moreover, to be entitled to relief, a plaintiff must show not merely that the SPD is inconsistent with the terms of the plan, but also that he or she relied upon, or was otherwise prejudiced by, the alleged inconsistency. See Chiles, 95 F.3d at 1519. Here we conclude that the Plan and the SPD are not in conflict; that the district court erroneously relied on a provision in the SPD that governed vesting service instead of TOE; and that in any event, plaintiff has not shown that she relied on the SPD in deciding to accept the offer of full-time employment at US WEST.

The SPD states at page L9:

**Term of Employment (TOE)**
*Your "TOE" is used to determine your eligibility for a pension benefit.*
**Term of Employment (TOE)**
Your "Term of Employment" is the period of continuous employment generally beginning on your most recent date of hire at a

- 15 -

> Participating Company and ending on your date of separation. . . .
> Prior service at Interchange and Portability Companies may be
> included if specified requirements are met. . . .
> **Calculating Your TOE**
> To determine when you will be eligible for a service or
> disability pension under this plan, you must know how to calculate
> your "Term of Employment" (TOE).  The explanation and bridging
> rules described below apply only to TOE.  "Vesting service," used to
> determine eligibility for a deferred vested pension, is explained in the
> "Deferred Vested Pensions" section on page L31.
> Your TOE is measured in terms of completed years, months,
> and days of employment with a Participating Company.  Generally,
> TOE is equal to your service starting from your most recent date of
> hire by a Participating Company through your retirement date (last
> day on active payroll) or other termination of employment.
> For other employment periods that may be included in the TOE
> under this plan, refer to the "Divestiture Impact/Mandatory
> Portability Agreement (MPA)" section on page L11.  Additional
> details are contained in the Mandatory Portability Legislation
> documents maintained by US WEST, Inc.
> In addition, your TOE may also include prior periods of
> employment bridged under the TOE bridging rules.  See page L37 for
> additional information.

(Emphasis added.)

Based on this language, the district court concluded that TOE ordinarily

begins when the employee is hired by a Participating Company, but that an

employee's TOE may increase by either of two means; first, through prior service

at an Interchange or Portability Company, and second, through TOE bridging

rules.  (See Dist. Ct. Order at 9-10.)  The district court correctly determined that

Kaferly could not increase her TOE under the first alternative, concluding that

Kaferly was not covered by either the DIA or the MPA.  (See id. at 10-11.)

- 16 -

However, in analyzing the second alternative, the district court mistakenly relied on the wrong bridging provision. Directing its attention to the cross reference in the final paragraph of the SPD quoted above, the district court turned to page L37, where it states:

**Bridging Breaks in Vesting Service**

If you are vested and incur a period of severance of one year, upon reemployment by a Participating Company or a Non-Participating Company you will receive credit for prior periods of service, but not the period of severance. . . .

If the period of severance is greater than five years, prior service will not bridge until your TOE bridges after five years of continuous employment.

The district court relied on this language to conclude that the SPD unambiguously entitled Kaferly to bridge her prior service upon her completion of five additional years of service under US WEST,[7] and that therefore the EBC

---

[7]Specifically, the court found: 1) that Kaferly was vested at BTL before she left in 1978; 2) that she incurred a period of severance of greater than five years; and 3) that this severance ended when she became reemployed by US WEST, a Participating Company. (Dist. Ct. Order at 12-13.)

The district court found that Kaferly was vested at BTL based solely on Kaferly's affidavit; the court noted that US WEST offered no evidence to contest this point. In fact, US WEST submitted the affidavit of Mary Davis, contesting Kaferly's vesting status at BTL. US WEST argues that, to the extent that Kaferly's vesting status at BTL is material to the district court's ruling, it is a disputed issue of fact, such that Kaferly was not entitled to summary judgment. As discussed below, however, Kaferly was not entitled to summary judgment because the court relied on the wrong provisions of the SPD in analyzing Kaferly's benefits claim. Because we conclude that Kaferly was not entitled to bridge her prior service at BTL in any event, her vesting status at BTL is irrelevant.

acted arbitrarily and capriciously when it denied her bridge request. (<u>See</u> Dist. Ct. Order at 12-14.)

Upon review, however, it is clear that the provision relied upon by the district court deals with <u>vesting service</u> (the length of time an employee works to earn a deferred vested pension), not TOE calculation (the length of time an employee works to earn an actual service pension). It is true that on page L9 of the SPD, the reader is informed that "your TOE may also include prior periods of employment bridged under the TOE bridging rules," and that the SPD then refers the reader to page L37 for additional information. However, the "TOE Breaks in Service and Bridging Rules" appear at pages L10-11, not pages L37-38 (which instead clearly address "Vesting Breaks in Service and Bridging Rules").

Pages L10-11 govern the bridging of TOE:

**TOE Breaks In Service And Bridging Rules**

A break in TOE occurs whenever you terminate employment <u>with a Participating Company</u>. Bridging rules restore previous service if you are re-employed in accordance with the following circumstances: . . .
● Five-year bridging rule – If you had at least six months' TOE when your employment terminated and you are re-employed after a break of more than six months, your prior TOE will be recognized after you complete a five-year period of service, but your time away from work will not be credited.
. . .

**Divestiture Impact/Mandatory Portability Agreement (MPA)**
US WEST and other companies impacted by the 1983 divestiture (break up) of AT&T entered into the Mandatory Portability

Agreement (MPA) to preserve benefits of employees who move between companies that are covered by the agreement. The MPA currently covers US WEST, the other Interchange Companies (see Appendix A), and certain other related companies. The MPA describes how an employee's service will be credited for TOE, vesting, and other purposes when the employee moves from one MPA company to another. . . .

> The MPA only applies to you if you meet the following three (3) criteria:
> 1. As of December 31, 1983, you were [an active employee] . . . .

(Emphasis added.)

This language from the SPD comports with § 2.4 of the Plan discussed above. The bridging rules generally cover only periods of employment with a Participating Company. Because Kaferly's service with BTL does not count as "prior TOE" (under the Plan terms discussed above), she cannot bridge this service under the five-year bridging rule. Nor does Kaferly fall within the exception created by the DIA or MPA.

As a result, we conclude that the SPD does not conflict with the Plan, and therefore that the maxim that the summary plan description governs when it conflicts with the plan, see Semtner, 129 F.3d at 1393, is inapplicable here. See Charter Canyon, 153 F.3d at 1136 ("If the plan documents do not conflict, the important policy of protecting beneficiaries from misleading or false information contained in a summary plan description is not implicated.").

Furthermore, Kaferly has neither established nor argued that she relied on the <u>SPD</u> (or the Plan) in electing to return to full-time status at US WEST or to stay with US WEST after her return. Instead, her reliance was predicated on oral interpretations she received from the company. Accordingly, Kaferly cannot show prejudice from any alleged inconsistency between the SPD and the Plan. See <u>Chiles</u>, 95 F.3d at 1519.

At most, the cross-reference in the SPD to page L37 introduces some ambiguity as to which bridging rules a reader should refer. Even assuming that the SPD is substantively ambiguous to the extent that it is capable of an interpretation that permits bridging of Kaferly's prior service with BTL, the EBC's conclusion that Kaferly could not bridge her prior service was neither arbitrary nor capricious, but rather, was based on a good faith, reasonable interpretation of the plan documents as a whole. See <u>Millensifer</u>, 968 F.2d at 1010 (court must defer to retirement committee's reasonable construction absent administrative bias even where plaintiff offers rational alternative construction); <u>Woolsey v. Marion Labs., Inc.</u>, 934 F.2d 1452, 1460 (10th Cir. 1991) ("The Administrators' decision need not be the only logical one nor even the best one. It need only be sufficiently supported by facts within their knowledge to counter a claim that it was arbitrary and capricious.").

In conclusion, the district court erred in granting summary judgment sua sponte to Kaferly, and because there is no genuine issue of material fact, the language of the plan documents entitles US WEST to summary judgment as a matter of law.

II. Federal Common Law Equitable Estoppel Claim

Kaferly argues in her Answer Brief that the elements of equitable estoppel were present in this case and that US WEST should be estopped from denying the benefits it promised to Kaferly.

Kaferly did not formally appeal from the district court's grant of summary judgment in favor of US WEST on her claim for equitable estoppel. However, we may consider her argument as a possible alternative basis for affirming the district court's sua sponte grant of summary judgment in her favor.

Kaferly's claim of equitable estoppel is without merit. In Miller v. Coastal Corp., 978 F.2d 622, 624-25 (10th Cir. 1992), we explicitly rejected a federal common law estoppel claim under ERISA. In that case, the plaintiff brought an equitable estoppel claim against his employer, alleging that he had been told by his employer that certain prior service would be computed in such a way that it would augment his pension benefits. See Miller, 978 F.2d at 623. For ten years thereafter, the plaintiff received annual statements that in fact computed his

projected benefits in such a way, confirming his employer's oral representations. See id. Upon retirement, however, his pension benefits were not calculated the way he had been told they would. See id. at 624. The plaintiff, conceding that the terms of the plan contradicted the employer's representations, argued that the defendants' oral and written representations nonetheless entitled him to the benefits promised, and that the defendants were equitably estopped from denying such benefits. See id.

In analyzing Miller's claim, we noted that, under Straub v. Western Union Tel. Co., 851 F.2d 1262, 1265 (10th Cir. 1988), no liability exists under ERISA for purported oral modifications of the terms of an employee benefit plan. See Miller, 978 F.2d at 624. We extended this rule in Miller's case to hold that "[a]n employee benefit plan cannot be modified . . . by informal communications, regardless of whether those communications are oral or written." Id. (citation omitted). Relying on language in Straub, we rejected Miller's effort to have this Circuit recognize a federal common law estoppel claim under ERISA, see id. at 625, and declined to deem Miller's circumstances as "egregious" or "extraordinary," noting that:

> [Miller] makes no allegations of lies, fraud, or intent to deceive on the part of the [defendants]. Mr. Miller refers to the written representations simply as a "mistake" made by the defendants. Although the mistake directly conflicted with the terms of the plan, which he suggests he never saw, he could have obtained the

"instruments under which the plan is established or operated" upon written request. 29 U.S.C. § 1024(b)(4).

Id.

Likewise, Kaferly makes no allegations of intent to deceive, and at most, the misinformation she was given can be called a mistake.[8] It is true that the representations made to her conflicted with the terms of the Plan, but Kaferly presumably could have obtained a copy of the Plan. In short, her estoppel claim, even if properly presented, fails on the merits. The district court properly dismissed this claim.

## CONCLUSION

For the reasons stated above, we REVERSE the district court's award of summary judgment to plaintiff, and REMAND to the district court with instructions to enter summary judgment in favor of the defendants.

ENTERED FOR THE COURT

David M. Ebel
Circuit Judge

---

[8]Miller left open the issue of whether estoppel might apply in limited, extraordinary circumstances, see Miller, 978 F.2d at 625, and so do we here. Whether or not estoppel might apply in limited, extraordinary circumstances, there are no such circumstances here that require us to consider the issue.